[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of the marriage brought by plaintiff wife against the defendant husband. The parties were married in January of 1992 and separated in June of 1994. There are no children issue of this marriage. The plaintiff has resided in the state of Connecticut for at least one year prior to the bringing of this action. Neither party has received state, local or federal aid.
Both parties had been married previously and divorced. The plaintiff had two children by her prior marriage, one of whom is in college and the other, Vincent, lived with her. The defendant had sons by his prior marriage, all of whom resided with their mother.
The plaintiff was 42 years old at the time of the marriage and the defendant was 54 years old. They had relatively similar incomes, between $40,000 and $50,000 each. The plaintiff worked for Price Waterhouse in the marketing department and the defendant was a design engineer for North American Phillips Corporation in Briarcliff Manor, New York. At the time this action was being tried, both parties earned $50,000 a year, but following the trial, plaintiff's employment was terminated without any reason being given.
The plaintiff also received income from a tenant in the amount of some $600 a month and child support payments which she listed on her latest financial affidavit at $50 a week. The payments had changed because of the age of the older child who was in college.
The parties had lived together for six months prior to their marriage in January of 1992. At that time, the defendant owned a half interest in his ex-marital home in Purdy, New York and in a cabin in northern New York state. He valued the cabin at $123,000, giving the value of his interest at $61,500. He also valued the ex-marital home in Purdy, New York at $190,000 with his half interest equaling $95,000.
At the time of the marriage, the defendant had two cars: a 1980 Chevrolet and a Cadillac which he later sold for a $1,000. CT Page 1323-P The plaintiff had a 1990 Pontiac Grand Am, which the defendant later turned in on the purchase of a 1990 Voyager in his name.
At the time of the marriage, the defendant also had a 401K account to which he contributed ten percent of his weekly income and he had a vested pension with the company. The plaintiff also had a 401K plan.
The plaintiff's liabilities at the time of the marriage consisted primarily of the mortgages on the house which left her very little, if any, equity in it. She had bought it for $281,000 in October of 1990 with a down payment of $28,100 (see exhibit plaintiff's exhibit A). The plaintiff had been in bankruptcy in 1991 due to a failing part time business and the foreclosure of a prior home in Bethel. Consequently, she had few liabilities other than the mortgages at the time of the marriage.
The defendant, on the other hand, testified that his outstanding liabilities amounted to $25,000 consisting in part of $6200 owed to his former attorney for his divorce and $19,000 in credit card debt. (See pages 35-36 of transcript dated July 19, 1995 and pages 82-83 of transcript dated August 1, 1995.) The defendant paid child support by paying taxes on his former marital home in New York state.
A. REASON FOR BREAKDOWN OF THE MARRIAGE
According to the plaintiff, the problems with the marriage began very soon after the parties returned from their honeymoon. It appears that the defendant was extremely controlling, insisting on knowing every detail of the plaintiff's activities, monitoring her telephone calls as well as any time spent out of the home whether at work or otherwise. He also insisted on opening her mail although he had his mail directed to his prior home in New York state. He also had information with respect to his pension and his 401K directed to that address and he kept all of his finances secret from the plaintiff while at the same time insisting on knowing all about hers.
The defendant was also extremely parsimonious requiring the plaintiff, for example, to prepare coffee at home, put it into a thermos and carry it to the train station on her way to work rather than buying a 75 cent cup of coffee at the train station as she had been accustomed to do. He also, on one occasion, rescued an almost empty jar of mustard that the plaintiff's son had thrown CT Page 1323-Q into the trash. His claim was that mustard does not go bad. He also criticized the plaintiff repeatedly for extravagance particularly when she bought two suits from Saks Fifth Avenue for which she paid.
The defendant's sole response to the plaintiff's description of the reasons for the breakdown was that the plaintiff had forged or had someone forge his name to a quitclaim deed of his half interest in the marital home — transferred to him previously as a means of obtaining refinancing of two mortgages. He did not deny any of her description of his behavior. Instead he focused entirely on charging his wife with forgery and pursuing that charge with filing a criminal complaint with the police the day after he was served with divorce papers. In fact, most of the trial concerned his claim of forgery. However, the experts disagreed and the stories of the parties differed except as to one thing; that is, that the plaintiff admitted she had a friend of hers, a notary, notarize the signature of the defendant on the quitclaim deed without the defendant being present.
In response to the defendant's filing of a criminal complaint with the police, the plaintiff was brought before the court and requested and received accelerated rehabilitation. She was put on probation for a year and ordered to pay the defendant's attorney's fees in the amount of $4,000. Upon successful completion of the probation, the record would be erased. As a further consequence of the criminal action, the plaintiff lost her friend Marie whom she had asked to notarize the quitclaim deed without the defendant being present.
The alleged forgery and the defendant's action in pursuing a criminal complaint against his wife and spending considerable time and attorney's fees in attempting to get a conviction was more indicative of a prior breakdown of the marriage than evidence that that act was the cause of the breakdown. The validity of the defendant's claims makes it necessary that his credibility be evaluated.
The only thing that was clearly proved and was admitted to by the plaintiff was that she had asked the notary to acknowledge the defendant's signature without his being present.
To that end, the testimony of the defendant's ex-wife Linda is revealing. First she said she could not believe a word he spoke, took everything he said with a grain of salt. For example, CT Page 1323-R the defendant denied that he and the plaintiff were divorcing while he was at the same time telling her that Marie had embezzled thousands of dollars and was in trouble with the federal government. The defendant also told her that Marie was about to lose her job and that he had been in contact with Marie's company.
The defendant's ex-wife also said that while her divorce against the defendant was pending he tried to get her arrested for removing an old car from her property. The case was dismissed. In that divorce, the defendant failed to list his pension and his 401K as assets. (See exhibit SS.)
In addition, the defendant also tried to get his ex-wife and a notary to notarize a document as being the original of the document (a letter between the defendant and his sister). When they refused, he then had the notary notarize the signatures of his ex-wife and himself and then he wrote on the document that it was the original. See plaintiff's exhibit PP.
The defendant also identified what purported to be his ex-wife's signature on a 1992 joint tax return as that of his ex-wife. However, his ex-wife testified that she had refused to sign that return. The defendant then claimed that it was done by the plaintiff. (See exhibit AA, form 8332.)
Before this court, as well, the defendant has been less than candid. For example, on neither of his affidavits, April or July of 1995, did he list his pension which is totally vested as one of his assets. He also understated the value of his 401K by some $20,000. In seeking to explain his failure to state the true value of the 401K, the defendant claimed that he could not get the information from the company because there was a freeze on during the time that he was asking for it which was between March and April of 1995. The evidence then showed that there was a freeze but it did not begin until May, and when the court ordered the defendant to produce the information the next day, he faxed a document dated in March, 1995 to plaintiff's counsel. This revealed that instead of $55,000 as reflected in the defendant's affidavit the value of the pension as of that date was some $70,000.
The defendant also listed as one of his weekly payments $50.00 a week to pay a lawyer's fee when the fee itself had already been paid in full. CT Page 1323-S
All of the above actions of the defendant cast considerable doubt on his credibility.
Consequently, the court finds the defendant has not proven by clear and convincing evidence that any fraud was committed or that the plaintiff forged or had forged the defendant's signature to the quitclaim deed which returned his interest in the marital home to her.
It ought to be said parenthetically that the original transfer of the half interest to the defendant by the plaintiff was as a part of a refinancing on the property urged by the defendant. The purpose of quitclaiming a half interest to the defendant and then making him a party to the mortgage was to satisfy the bank's needs for security. (The defendant apparently assumed it was not a real transfer of ownership because he made no effort to pay any part of the mortgage and left that entirely to the plaintiff.)
The court, therefore, finds that the cause of the breakdown of the marriage was principally the fault of the defendant and resulted from his behavior to his wife.
FINANCES
The defendant in this case has asked that the court transfer to him a hundred percent of the plaintiff's interest in her home subject to the existing mortgage which he will assume. He also asks that she be responsible for the amount of his liabilities listed on his financial affidavit in the amount of $28,500 because he believes those were debts incurred during the marriage.
The defendant also asks that his attorney's fees and disbursements be paid by the plaintiff and that the court retain jurisdiction over the matter as to the issue of reasonable attorney's fees and costs. He also asks that no alimony be awarded to either party and that the plaintiff be responsible for her own liabilities as shown on her financial affidavit exclusive of the mortgage which he would assume following the transfer of the marital residence to him. He also asked that he be permitted to retain the Plymouth Voyager which he now claims was not his car at all, that he had other cars and, therefore, did not need it.
The court is somewhat astonished by these claims given what the court finds to be the facts in this case. CT Page 1323-T
The fact is that the defendant benefited enormously from his relationship with the plaintiff. He had a rent free home belonging to the plaintiff from the time they first began living together in 1991. He used the plaintiff's car as a down payment on his car and even was the recipient of car payments that she made for him. Most of the food was provided by the plaintiff. The defendant claims that that amounted to $75.00 a week, but in his own affidavit, his estimate of what it costs him is $140 a week and he is living alone. The plaintiff also gave him a generator and some appliances for the defendant's cabin in New York state where there was no electricity, no running water and an outhouse as a toilet.
The change of the defendant's living conditions from before his relationship to the plaintiff to his residence in her home was dramatic. Before they lived together, the defendant was living in his cabin in New York state which, as described above, had no electricity, no running water and an outhouse. He also slept in his office some of the time. The plaintiff described his appearance as being somewhat scruffy so that she did try to spruce him up after they started to live together.
The defendant's request that the Voyager be turned over to him is strange since it is presently in his possession. He took it with him when he left the house. It is also in his name although it was purchased by using the plaintiff's Grand Am as a down payment and the defendant admits the plaintiff made some of the car payments. His claim that she be responsible for his liabilities which he claims were incurred during the marriage is also somewhat strange. While they were married, both of them supposedly contributed to the household. On the face of it, since the plaintiff paid for the mortgage and the food and some of the utilities and some of the defendant's car expenses, it would appear that the plaintiff was responsible for the bulk of the expenditures.
The figures offered by the defendant to prove how much he spent during the marriage in order to obtain reimbursement for those expenditures are difficult to accept seriously. One of the obligations of marriage is mutual support. If the defendant feels that his expenditures somehow were not part of his obligations to support his wife during that time, perhaps he needs enlightening on that point. CT Page 1323-U
The further fact is that during the marriage the defendant's 401K increased in value from $44,597.04 in December of 1991 to $77,781 as of March 31, 1995 — a difference of $33,184.77. The only increase in the plaintiff's situation was that the value of the equity has increased but not enough to cover her initial expense which was $28,000. The defendant, incidentally, never offered to reimburse her for that down payment or any part of it. Further, the defendant appears to have spent more since the separation than he did during the marriage. (See plaintiff's exhibits II and JJ and defendant's exhibit 34.)
At the present time, the defendant is still earning $50,000 a year, he still has a vested pension valued at $242,264, which provides him with a monthly normal retirement benefit payable at age 65 of $624.08. He also has two pieces of property in New York state, in one his interest is valued at $95,000 and the other his interest is $60,000. He is perfectly capable of taking care of his expenses, his attorney's fees and liabilities.
The plaintiff, on the other hand, has lost her job probably in part because of her arrest brought about by her husband, and her only asset is the house in which she has about $25,000 in equity. In the past, she has had a tenant but there appears to be none now. She is in need of support at this time.
After having considered all of the elements required under §§ 46b-81, 46b-82 and 46b-84, the court makes the following findings and orders:
1. The parties were married in January of 1992 and separated in June of 1994.
2. The marriage has broken down irretrievably with no hope of reconcilation [reconciliation] and it is hereby dissolved.
3. There are no minor children of this marriage.
4. The plaintiff has resided in this state for at least a year prior to the beginning of this action; therefore, the court has jurisdiction.
5. Neither party has been the recipient of local, state or federal aid.
6. The plaintiff's maiden name of Marie Marini is hereby CT Page 1323-V restored.
7. The defendant shall pay to the plaintiff as lump sum alimony not dischargeable in bankruptcy the sum of $16,900 either in cash or by a conveyance through a qualified domestic relations order (QDRO) of so much of his 401K plan as equals that amount. The plaintiff's counsel shall draw an appropriate order for this purpose.
8. The defendant shall transfer to the plaintiff all his right, title and interest in the marital home at 25 Fairty Drive, New Canaan, Connecticut.
9. The plaintiff shall transfer to the defendant all her right, title and interest in the Dodge Voyager which the defendant is presently using. The defendant shall be responsible for and hold the plaintiff harmless from any outstanding loan on this vehicle.
10. Each party shall be responsible for the liabilities listed in his or her affidavit and for his or her attorney's fees.
11. The defendant may retain ownership of his pension plan and so much of his 401K plan as exceeds the amount to be conveyed to the plaintiff should he choose that method of payment of the lump sum alimony.
12. The defendant may also retain his interest in his New York ex-marital home in Purdy, New York and in the cabin in New York state.
13. No wage execution shall enter unless the plaintiff elects to receive her lump sum alimony in cash payments over a period of time. If she so elects, then a wage execution shall enter.
MARGARET C. DRISCOLL STATE TRIAL REFEREE CT Page 1323-W